IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

BECKY LEAKE,                          §
                                      §
                     Plaintiff,       §
                                      §  Civil Action No. 3:04-CV-2707-D
VS.                                   §
                                      §
KROGER TEXAS, L.P., et al.,           §
                                      §
                     Defendants.      §

MEMORANDUM OPINION
AND ORDER

    In this action to recover medical and income replacement
benefits under an ERISA[1]-qualified occupational injury or disease
benefits plan, the court must decide whether plaintiff is entitled
to relief based on the Plan Administrator's alleged violations of
ERISA and related regulations in handling her claim and whether the
Plan Administrator abused its discretion in denying benefits.
Concluding that plaintiff has failed to establish continuous ERISA
procedural violations that resulted in prejudice, and that the Plan
Administrator did not abuse its discretion, the court grants
defendants' motion for summary judgment and dismisses this suit.

I

    Plaintiff Becky Leake ("Leake") sues defendants Kroger Texas,
L.P. ("Kroger") and Kroger Texas Occupational Injury or Disease
Benefits Plan (the "Plan") to recover Plan benefits that she
maintains were wrongly denied her after she suffered an on-the-job

---

[1]Employee Retirement Income Security Act of 1974, 29 U.S.C. §§
1001-1461.

injury to her hands.  Kroger denied Leake's claim for Plan benefits on the grounds that (1) she had failed to report the occupational injury to her supervisor or to a designated Kroger representative as soon as she was aware of it, (2) she had used the services of an unapproved health care provider, and (3) her injury did not qualify as an occupational injury under the Plan.  Leake appealed Kroger's decision to the Plan Administrator,[2] who upheld the decision denying benefits.  Leake now sues Kroger and the Plan under 29 U.S.C. § 1132(a)(1)(B), and defendants move for summary judgment.[3]

As of July 2002, Kroger had employed Leake for approximately 20 years, including 17 years as a cashier and scanner.  Under the Plan, which is an ERISA plan, Kroger provides employees with income replacement benefits for occupational injuries and diseases.  In March 2002 Leake requested a medical leave of absence, initially

---

[2]In their brief, defendants at times refer in the plural to the "Plan Administrators." *See, e.g.*, Ds. Br. 9.  Moreover, there are documents in the record that indicate the decision to uphold Kroger's denial of benefits was made by the "Plan Administrators," and suggest that the Plan Administrators met as a body to consider Leake's appeal.  *See* Ds. App. 289.  Because the Plan uses the singular term "Plan Administrator," which it defines as including a "person or persons responsible for the administration of the Plan benefits," and "a committee of one or more persons to serve as the Administrator of this Plan," *see* Ds. App. 16, the court in this memorandum opinion will refer in the singular to "Plan Administrator."

[3]Defendants object to parts of Leake's summary judgment evidence.  The court need not specifically address the admissibility of this evidence because it concludes that Leake is not entitled to relief.  Accordingly, the admissibility question is moot.

asking for 11 days, from February 28 to March 11, 2002. In February 2003 Kroger notified Leake that her official leave had expired and that she was on an unauthorized leave of absence. Leake did not return to work, and Kroger terminated her employment.

During 2000 Leake began suffering episodes of painful and debilitating swelling, tenderness, numbness, and loss of strength in her hands. They continued until March 2002, when Leake took a leave of absence from Kroger. In the Request for Leave of Absence form, she checked the box for "illness" rather than an "injury." Ds. App. 24.

At about that time, Leake initially sought treatment for her condition from Randall C. Perkins, D.O. ("Dr. Perkins"). He noted in February 2003 that Leake "is known to have diabetes and changes consistent with diabetic neuropathy" as well as "Raynaud's phenomena." Ds. App. 161. Dr. Perkins did not diagnose Leake's condition, but he noted a "strong suspicion of a connective tissue disease." *Id.* He "felt very strongly this suggested a serious condition called scleroderma." *Id.*

On a referral from Dr. Perkins, Leake sought treatment from Thuan Vu, M.D. ("Dr. Vu"), a rheumatology specialist, in March 2002. Dr. Vu diagnosed Leake's condition as "[p]ositive ANA, with arthralgia, Raynaud's phenomenon," "[p]ossible underlying connective tissue disorder," and "[p]ossible seronegative rheumatoid." *Id.* at 65. During a May 2002 follow-up visit, Dr. Vu

diagnosed "Arthralgia, positive ANA with mildly elevated CPK and Raynaud's phenomenon," and "[p]ossible underlying undifferentiated connective tissue disorder and also a component of diabetic hand syndrome." *Id.* at 69.

In May 2002 Leake saw Cherie H. O'Brien, M.D. ("Dr. O'Brien"), a neurologist, who diagnosed bilateral carpal tunnel syndrome ("CTS"). *Id.* at 125. Leake then sought a surgical consultation with Brent T. Alford, M.D. ("Dr. Alford"), a neurological surgeon. Dr. Alford described Leake as a patient who was "currently undergoing workup for some type of connective tissue disease, possibly scleroderma." *Id.* at 138. He noted that "[s]he has Raynaud's type phenomena" and that "[o]ver the past 2 to 3 years she has had episodes of pain, numbness, and tingling out into her first three digits of each hand." *Id.* Dr. Alford's recommendation included the opinion that "[i]t's unclear what component her underlying connective tissue disease/possible scleroderma is playing in this scenario." *Id.* at 139. Although Dr. Alford noted that Leake worked as a cashier, he did not indicate what he believed to be the cause of her CTS.

In July 2002 Dr. Alford performed carpal tunnel release surgery on Leake's left hand, noting in his operative report that Leake has "a yet to be diagnosed connective tissue disease, possibly scleroderma." *Id.* at 146. Leake reported no improvement one week following surgery, and Dr. Alford "cautioned her that due

to the uncertainty of her diagnoses," she might not experience "the usual progression of symptom improvement after surgery." *Id.* at 287.

On September 2, 2002, after she had exhausted her paid leave from Kroger, Leake telephoned Kroger's Risk Management Department and spoke with Debbie Cantu ("Cantu"). Leake explained to Cantu that she had already undergone surgery, that her left hand was not healing properly, that she had exhausted her 13 weeks of pay from insurance and/or the union, and that she could not obtain an extension. Leake also told Cantu that she had used up the hours in her hour bank, had no medical benefits remaining, and could not have surgery on her right hand. She informed Cantu that she now wanted to report the injury as "work related."

Cantu responded that Leake would need to complete an Occupational Injury Report, which Leake did that day. Leake stated on the Associates Report of Accident form that she had suffered an on-the-job injury on approximately February 15, 2002. After Jim Dickinson ("Dickinson"), the Plan Manager, obtained copies of Leake's medical records, he forwarded them to Melissa D. Tonn, M.D. ("Dr. Tonn"), a board certified occupational physician. Based on her review of the medical records, Dr. Tonn opined, in relevant part, that "[n]one of [Leake's] conditions, nor her presentation with hand and arm symptoms can be reasonably assumed the result of her work with Kroger." *Id.* at 150.

Kroger denied Leake's claim for benefits on the grounds that (1) she had failed to report the occupational injury to her supervisor or to a designated Kroger representative as soon as she was aware of it, (2) she had used the services of an unapproved health care provider, and (3) her injury did not qualify as an occupational injury under the Plan.  Leake appealed Kroger's decision and submitted additional medical records for review.  At her attorney's request, Kroger provided a copy of her claim file. The Plan Administrator denied Leake's appeal.

Through her attorney, Leake disputed this determination.  She submitted additional materials and requested that they be made part of the administrative record.  The parties met to discuss Leake's reasons for challenging the denial of her claim, and Kroger agreed to reconsider her request for benefits following receipt of additional information.  The requested information included medical records that Leake maintained indicated that her condition was work related, an explanation of the "incident" or "injury" that purportedly occurred on February 15, 2002, and an explanation of when and why Leake changed her mind about whether her condition was work related.  Following an interval of several months, Leake's attorney submitted additional documents for the administrative record, and Kroger forwarded the documents to Dr. Tonn for review. The Plan Administrator did not change its decision, and this suit followed.

II

The court decides as a threshold matter the nature of claim that Leake asserts in this lawsuit.

Leake brings this action under 29 U.S.C. § 1132(a)(1)(B), which provides that "[a] civil action may be brought——(1) by a participant or beneficiary—— . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" She alleges that Kroger denied her medical and income benefits to which she is entitled under the Plan as a result of various hand-related conditions. Am. Compl. ¶¶ 6-7 & 9. She also asserts that the denial did not comply with 29 U.S.C. § 1133[4] and the accompanying regulations. *Id.* at ¶ 8. And she avers that the Plan, through Kroger, in at least three respects acted inconsistently with its fiduciary duty to her: it applied a definition of "Occupational Injury" that is inapplicable under the

---

[4]29 U.S.C. § 1133 provides:

> In accordance with regulations of the Secretary, every employee benefit plan shall—(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

Plan; in denying her claim, it relied on a physician of uncertain credentials whose opinion reflected incorrect or selectively self-serving characterizations of Leake's medical records; and it ignored or dismissed for unstated reasons opinions of her medical providers that she suffered an occupational injury. *Id.* at ¶ 12.

Although in their summary judgment brief defendants address the § 1133 and 29 C.F.R. § 2560.503-1 allegations as if they formed the basis for independent claims, *see* Ds. Br. 24-30, in the claim that is asserted in her amended complaint, Leake seeks relief solely under § 1132(a)(1)(B).  She sues defendants to recover all unpaid medical and income benefits that she says are due her under the Plan, prejudgment interest, attorney's fees, expenses, and court costs.  Am. Compl. ¶ 12.[5]  Moreover, it is apparent from her brief that she relies on alleged violations of § 1133 and related regulations to demonstrate that the decision to deny her Plan benefits cannot stand and to recover in this lawsuit the benefits to which she contends she is entitled.  Accordingly, this lawsuit is properly viewed as one to recover unpaid benefits under § 1132(a)(1)(B).

---

[5]This ¶ 12 is the second of two that have the same number.

III

The court now turns to the merits of Leake's lawsuit.

A

A plan participant who is denied benefits under an ERISA plan can sue to recover them. *See* 29 U.S.C. § 1132(a)(1)(B). This court has jurisdiction to review determinations made by an ERISA employee benefit plan. *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 295 (5th Cir. 1999) (en banc). In conducting this review, a

> plan administrator's factual determinations are always reviewed for abuse of discretion; but its construction of the meaning of plan terms or plan benefit entitlement provisions is reviewed *de novo* unless there is an express grant of discretionary authority in that respect, and if there is such then review of those decisions is also for abuse of discretion.

*Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 226 (5th Cir. 2004). Under the Plan, "[t]he Administrator shall have full discretion as to each feature of this Plan, including, but not limited to, the payment or denial of benefits provided herein." Ds. App. 16. Moreover, "[t]he Administrator shall have sole and exclusive discretion in interpreting the provisions of the Plan, in making factual determinations related to the Plan, its benefits and eligibility, to make equitable adjustments, and in construing any disputed or ambiguous terms." *Id.* Accordingly, review of the Plan Administrator's construction of the meaning of Plan terms or Plan

benefit entitlement provisions is reviewed for abuse of discretion. *See, e.g.*, *MacLachlan v. ExxonMobil Corp.*, 350 F.3d 472, 478 (5th Cir. 2003) ("Where a plan administrator has been vested with the discretionary authority to interpret a benefit plan, a district court reviews the administrator's interpretations only for abuse of discretion."). Leake acknowledges in her brief that the Plan Administrator's decision is reviewed for abuse of discretion. *See* P. Br. 4-5.

"In reviewing a plan for abuse of discretion, the district court first must determine whether the administrator's interpretation is legally correct; if it is not, the court must decide whether the decision was an abuse of discretion." *MacLachlan*, 350 F.3d at 481 (citing *Abraham v. Exxon Corp.*, 85 F.3d 1126, 1131 (5th Cir. 1996); *Pickrom v. Belger Cartage Serv., Inc.*, 57 F.3d 468, 471 (5th Cir. 1995)). If "the fiduciary's interpretation of the plan was legally correct, the inquiry is over, pretermitting any need to consider whether a legally incorrect interpretation of the fiduciary was not an abuse of discretion." *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 270 (5th Cir. 2004). If the Plan Administrator's interpretation is not legally correct, the court must still decide whether the Plan Administrator abused its discretion.

Regarding the plan fiduciary's factual findings, "[t]he law requires only that substantial evidence support a plan fiduciary's

decisions, including those to deny . . . benefits." *Id.* at 273. "Regardless of the administrator's ultimate authority to determine benefit eligibility, however, factual determinations made by the administrator during the course of a benefits review will be rejected only upon a showing of an abuse of discretion." *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999) (citing *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir. 1991) ("When reviewing for arbitrary and capricious actions resulting in an abuse of discretion, we affirm an administrator's decision if it is supported by substantial evidence.")). "If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." *Ellis*, 394 F.3d at 273.

"'[R]eview of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness—even if on the low end.'" *MacLachlan*, 350 F.3d at 478 (quoting *Vega*, 188 F.3d at 297).

B

1

When a plan "administrator's decision is tainted by a conflict of interest, the court employs a 'sliding scale' to evaluat[e] whether there was an abuse of discretion." *Id.* (citing *Vega*, 188 F.3d at 297). "The greater the evidence of conflict on the part of

the administrator, the less deferential [the] abuse of discretion standard will be." *Vega*, 188 F.3d at 297.   When the record is sufficient to establish "a minimal basis for a conflict" of interest, the court "review[s] the decision with 'only a modicum less deference than [it] otherwise would.'" *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 343 (5th Cir. 2002) (quoting *Vega*, 188 F.3d at 301 ("On our sliding scale, therefore, we conclude that it is appropriate to review the administrator's decision with only a modicum less deference than we otherwise would.")).

                                    2

     Leake maintains that the Plan Administrator's decision is entitled to less deference.   She posits that Dickinson, the Plan Manager, addressed her claim as a plan administrator and is a Kroger employee and its Risk Management Representative.   The money to pay benefits would come from Kroger's general assets.   She therefore maintains that, without considering any actual self-serving conduct, Kroger's exercise of discretion is subject to close scrutiny under the sliding scale approach.

     When the insurer and the administrator are the same entity, an "inherent conflict of interest" exists.   *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 395 (5th Cir. 2006) (citing *Lain*, 279 F.3d at 343).   The court will assume *arguendo* that because a plan administrator is a Kroger employee and Kroger is the insurer of the Plan, this creates the same "inherent conflict of interest" as

existed in *Robinson*.  *See id.*  Applying the sliding scale approach, "an administrator with such a conflict is 'entitled to all but a modicum' of the deference afforded to unconflicted administrators." *Id.*  The court will apply this adjusted level of deference in evaluating the decisions of the Plan Administrator in deciding Leake's claim.

IV

Leake maintains that the Plan Administrator violated several ERISA procedural requirements in denying her claim.  She argues that these violations, when combined with bad faith, require that the court afford less deference to the Plan Administrator's decision.

A

As a threshold matter, the court must decide whether——and, if so, how——the alleged violations on which Leake relies are pertinent to the court's review.  Failure to comply with ERISA procedural requirements generally does not give rise to a substantive damage remedy unless the violations are continuous and amount to actual harm.  *Hines v. Mass. Mut. Life Ins. Co.*, 43 F.3d 207, 211 (5th Cir. 1995) (citing cases) (addressing breach of fiduciary duty claims); *see also Duncan v. Assisted Living Concepts, Inc.*, 2005 WL 331116, at *4 (N.D. Tex. Feb. 10, 2005) (Godbey, J.) ("Procedural violations of ERISA do not entitle the plan beneficiary to a substantive remedy unless the beneficiary can prove continuous

violations resulting in some prejudice to the beneficiary."). "Challenges to ERISA procedures are evaluated under the substantial compliance standard." *Robinson,* 443 F.3d at 392 (citing *Lacy v. Fulbright & Jaworski,* 405 F.3d 254, 257 (5th Cir. 2005)). "This means that '[t]echnical noncompliance' with ERISA procedures 'will be excused' so long as the purposes of section 1133 have been fulfilled." *Id.* at 393 (citing *White v. Aetna Life Ins. Co.,* 210 F.3d 412, 414 (D.C. Cir. 2000)). Accordingly, to demonstrate that she is entitled to relief, Leake must show that the Plan Administrator violated ERISA under the substantial compliance standard and that the violations were continuous and prejudicial.

B

Leake complains that the Plan Administrator failed to give her adequate notice of the grounds for denying her benefits claim. She relies on the ERISA requirement that every employee benefit plan "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1); 29 C.F.R. § 2560.503-1(g) (2005).[6] Leake posits

---

[6]29 C.F.R. § 2560.503-1(g) provides:

> The notification shall set forth, in a manner calculated to be understood by the claimant--
> (i) The specific reason or reasons for the adverse determination; (ii) Reference to the specific plan provisions on which the

that the Plan Administrator's failure, apart from citing the Plan provisions, to state the reasons for denying her benefits claim violated § 1133(1) and the relevant regulations.

A court will excuse a failure to comply with the technical requirements of § 1133(1) and related regulations if the purposes of § 1133(1) are fulfilled. *Robinson*, 443 F.3d at 393. The purposes of the § 1133 notice provision are to ensure that a claimant understands the reasons her claim was denied and comprehends her right to review of the decision. *Kent v. United of Omaha Life Ins.*, 96 F.3d 803, 807 (6th Cir. 1996). To ensure that the claimant understands the reasons for the claim decision, a plan administrator must articulate the specific reasons for denying the claim, but it need not explain to the claimant "the reasoning behind the reasons." *Militello v. Central States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 689 (7th Cir. 2004)(quoting *Gallo v. Amoco Corp.,* 102 F.3d 918, 923 (7th Cir. 1996)); *see also Gallo*, 102 F.3d at 923 ("All [the plan administrator] has to give the

_____

> determination is based; (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review . . . .

applicant is the reason for the denial of benefits; he does not have to explain to him why it is a *good* reason.").

The Plan Administrator's initial letter denying Leake's claim was cursory in its explanation of the reasons for denying benefits. Without elaboration, it cited the relevant Plan provisions that she allegedly violated. The Plan provisions themselves explain in some detail, however, the rationale for denying a claim. Specifically, the Plan states that certain disqualifying conduct will result in the denial of benefits, and it specifies in plain English the various types of "disqualifying conduct." P. App. 5. The Plan Administrator promptly sent the denial letter to Leake and advised her how to appeal the decision.

Even if the court were to conclude, however, that the initial denial letter did not comply with the § 1133 notice provision, the series of communications between Leake's attorney and the Plan Administrator clearly apprised Leake of the reasons her claim was being denied. "[W]hen claim communications as a whole are sufficient to fulfill the purposes of Section 1133 the claim decision will be upheld even if a particular communication does not meet those requirements." *Kent*, 96 F.3d at 807; *see also Lacy*, 405 F.3d at 257 ("substantial rather than strict compliance with ERISA § 1133 and DOL Regulation § 2560.503-1(f) is all that the law

requires.").[7]  Here, the Plan Administrator sent the initial denial letter in October 2002.   In May 2003 it sent a letter denying Leake's appeal, setting forth in detail the specific Plan provisions on which the decision was based and the specific factual reasons for each ground.  This letter unquestionably complies with § 1133(1) and the relevant regulations.  Viewed together, the two letters are sufficient to satisfy the purposes of § 1133(1).

The court does not suggest, of course, that a cursory initial denial letter followed by a more detailed letter denying a claimant's appeal will always be sufficient to satisfy the notice provision of § 1133.  But the two letters in this case are sufficient because the Plan Administrator afforded Leake further review after it sent the letter denying her appeal.  Also, Leake's arguments in support of her appeal, and her arguments made thereafter, are substantially similar, suggesting that the more detailed letter denying her appeal did not apprise her of any new facts of which she was not already aware.  Accordingly, the court concludes that the Plan Administrator substantially complied with ERISA's notice provisions.

Assuming *arguendo* that the Plan Administrator's denial failed to comply substantially with § 1133(1), the violation would not

---

[7]The text of the DOL Regulation referred to in *Lacy* was amended and can now be found in § 2560.503-1(g).  *See* 65 Fed. Reg. 70,246 (Nov. 21, 2000) (revising 29 C.F.R. § 2560.503-1).

entitle Leake to relief, because she has not shown prejudice resulting from the alleged inadequate notice of the reasons her claim was denied.

C

Leake also argues that she was not supplied certain documents to which she was entitled under 29 C.F.R. § 2560.503-1(h)(2)(iii) (2005).  This regulation provides that for full and fair review, a claimant must be "provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits."[8] *Id.*  The information that Leake requested and was allegedly denied

_____

[8]29 C.F.R. § 2560.503-1(m)(8):

> A document, record, or other information shall be considered 'relevant' to a claimant's claim if such document, record, or other information. (i) Was relied upon in making the benefit determination; (ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; (iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination; or (iv) In the case of a group health plan or a plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination.

- 18 -

consisted of (1) the medical records in her claim file, (2) the medical records that the physician consultant reviewed, (3) the medical literature on which the physician consultant relied, and (4) information as to potential conflicts of interest involving the Plan's physician consultant.

After filing the appeal, Leake's attorney requested a copy of Leake's claim file.  In response, the Plan Administrator provided the file, excluding the duplicate medical information that Leake had sent Kroger.   The Plan Administrator thus substantially complied with 29 C.F.R. § 2560.503-1(m)(8).   As noted above, "'[t]echnical noncompliance' with ERISA procedures 'will be excused' so long as the purposes of section 1133 have been fulfilled." *Robinson*, 443 F.3d at 393 (citing *White*, 210 F.3d at 414).  Because Leake already had copies of her medical records, the Plan Administrator's failure to provide her duplicates did not violate ERISA under the substantial compliance standard.

In a separate letter dated May 5, 2003, Leake's attorney requested directly from Dr. Tonn copies of the doctor's resume and of any documents she reviewed in connection with the review of Leake's claim.  Dr. Tonn failed to comply with this request.  But this failure does not lead to the conclusion that *the Plan Administrator* failed to comply substantially with the requirements of 29 C.F.R. § 2560.503-1(m)(8).   And assuming *arguendo* that Dr. Tonn's failure to respond can be attributed to Kroger, her

- 19 -

technical noncompliance did not undermine the purposes of § 1133(2). Consequently, the court concludes that Kroger substantially complied with ERISA in this respect.

Section 1133(2) and the accompanying regulations are intended to ensure a full and fair review of the denial of a benefits. *See* 29 U.S.C. § 1133(2) ("[E]very employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.") Leake contends she was denied access to certain documents, but she has not presented evidence that supports the conclusion that her right to a full and fair review was affected by the denial.

First, Leake did not request the documents allegedly denied her until *after* she had already filed her appeal. She cannot plausibly contend that she was prevented from obtaining a full and fair review due to the denial of access to documents when she did not request copies before she appealed.

Second, Leake had several opportunities to obtain full review of her claim. She was able to appeal the initial denial of benefits. When the decision was upheld, the Plan Administrator met personally with her attorney to discuss the denial. At this meeting, the Plan Administrator agreed to consider again her claim and explained to her attorney exactly what additional information would be necessary to assist in the determination. None of these

facts suggests that Leake was denied the opportunity for a full and fair review of her claim.

Third, Leake does not contend that she was denied the opportunity for a full and fair review under § 1133(2). She points instead to Kroger's failure to comply with the technical requirements of 29 C.F.R. § 2560.503-1(m)(8) as evidence of bad faith and an abuse of discretion. But minor violations of the technical requirements of the regulation may not even violate ERISA when, as here, there has been substantial compliance. *See Robinson*, 443 F.3d at 393. And Leake adduces no evidence that would permit a finding that there was a continuous violation that amounted to substantive harm. *See Hines*, 43 F.3d at 211. She has not produced evidence that would permit a finding of prejudice or harm resulting from Kroger's failure to supply her with the documents she requested from Dr. Tonn.

D

Leake also asserts throughout her brief that the Plan Administrator failed to consider certain evidence contained in her claim file and submitted in connection with her appeal. She maintains that the Plan Administrator ignored evidence that Leake discovered her CTS in July 2002, and that it disregarded evidence that her supervisor mishandled the reporting of her medical problems. Leake posits that this failure to consider evidence violates § 1133(2) and 29 C.F.R. § 2560.503-1(h)(2)(iv). Under

- 21 -

§ 2560.503-1(h)(2)(iv), a plan administrator must "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." *Id.*

In deciding a claim, a plan administrator is not obligated to rebut specifically all evidence that the claimant offers. As explained above, a plan administrator is only required to state the specific reasons for denying the claim. *Kent*, 96 F.3d at 807; *Militello*, 360 F.3d at 689. The Plan Administrator met this disclosure obligation in its June 9, 2003 letter, and it was under no obligation to answer and specifically rebut each piece of evidence that Leake offered. Other than the Plan Administrator's failure to rebut specifically Leake's evidence, Leake can point to no fact that would permit the court to find that the Plan Administrator refused to consider any of her evidence.

E

Leake also contends that the Plan Administrator breached its fiduciary duty to her by engaging in inequitable conduct. She argues that when she reported her occupational injury to her supervisor, she was not given facts about properly filing a claim or obtaining approval for her medical providers. Leake maintains that the Plan Administrator told her it was reviewing her claim from a medical standpoint when it was already beginning to

- 22 -

formulate non-medical reasons for denying her claim.  Leake posits that this conduct violates the doctrine of unclean hands because ERISA does not permit a fiduciary to engage in inequitable conduct in order to frustrate a claimant's rights.

The Plan provides that as soon as an employee is aware of an injury or occupational disease, she should report it to her supervisor.  The employee's "supervisor or other designated Kroger representative will assist [the employee] in obtaining any necessary medical treatment and in completing the forms necessary to document such an injury."  P. App. 4.  Leake's evidence shows that, once she decided to report her condition as work related, Cantu, an employee in Kroger's Risk Management Department, assisted Leake in determining the necessary procedures for filing a claim. The Plan Administrator could not have been expected to assist Leake in filling out the required paperwork and finding approved physicians for an occupational injury *before* she reported such an injury.  The court declines to find that the Plan Administrator breached its fiduciary duty to Leake by violating the Plan.[9]

---

[9]Leake has not filed a claim for breach of fiduciary duty. Thus any alleged breach of a fiduciary duty is only relevant insofar as it suggests that the Plan Administrator violated ERISA continuously, thereby prejudicing Leake.

F

In sum, the court could at most find that the Plan Administrator committed technical violations of ERISA regulations, but that none was significant enough to undermine the purposes of ERISA. *See Robinson*, 443 F.3d at 393. The Plan Administrator substantially complied with the notice and review procedures of ERISA, and Leake has not presented sufficient evidence to support a finding that the Plan Administrator violated any other provisions.

Leake argues that the court should afford the Plan Administrator's decision less deference because there are evident violations of ERISA and its implementing regulations that, as *Baker v. Metropolitan Life Insurance Co.*, 364 F.3d 624 (5th Cir. 2004), recognizes, constitute abuse of discretion, especially when combined with evidence of bad faith. *Baker*, however, does not stand for this proposition. It holds that "if an administrator interprets an ERISA plan in a manner that directly contradicts the plain meaning of the plan language, the administrator has abused his discretion even if there is neither evidence of bad faith nor of a violation of any relevant administrative regulations." *Id*. at 630 (quoting *Gosselink v. AT&T, Inc*., 272 F.3d 722, 727 (5th Cir. 2001)). This statement is inapposite to Leake's argument that bad faith, when combined with violations of ERISA, constitutes abuse of discretion.

ERISA violations must be continuous and must amount to substantive harm in order to affect the amount of deference the court gives the Administrator's decision. *See Hines,* 43 F.3d at 211. Not only has Leake failed to adduce sufficient evidence to permit a finding of an ERISA violation, but the alleged violations on which she relies were neither continuous nor prejudicial to her benefits claim. Consequently, the court will evaluate the Plan Administrator's denial of claim benefits under the sliding-scale abuse of discretion standard described above. It will not, as Leake requests, afford the Plan Administrator less deference due to its technical violations of certain ERISA procedural requirements.

IV

The court now addresses whether the Plan Administrator abused its discretion in denying Leake's claim for benefits. The court first determines whether the Plan Administrator's interpretation of the Plan is legally correct; if it is not, the court must determine whether the decision was an abuse of discretion. *See MacLachlan*, 350 F.3d at 481.

A

The court assesses three factors to determine whether the interpretation is legally correct: (1) whether the Plan Administrator has given the Plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the Plan, and (3) any unanticipated costs resulting from different

interpretations of the Plan. *Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992). Leake has neither alleged nor presented evidence that the Plan was not given a uniform construction or that there were unanticipated costs that resulted from different interpretations of the Plan. Therefore, the court's inquiry focuses on whether the Plan Administrator's interpretation is consistent with a fair reading of the Plan. *See Vercher*, 379 F.3d at 228 ("the essential inquiry here is whether [the Plan Administrator's] interpretation of the plan was fair and reasonable, as [the plaintiff] did not allege that the construction of the plan was not uniform or that there were unanticipated costs.")

Leake first argues that the Plan Administrator incorrectly interpreted the notice provision of the Plan as requiring solely formal written notice. The Plan Administrator did not state that the Plan required formal written notice. Rather, it found that, under the facts of the case, Leake had not adequately complied with the requirement that an employee must report an occupational injury to her manager or supervisor as soon as she is aware of it. The Plan Administrator's decision that Leake did not comply with the notice provision turns on whether she in fact gave notice of her occupational injury as soon as she was aware of it. Leake's compliance *vel non* with the notice provision is a question of fact, not a question of legal interpretation. There is no evidence that

suggests that the Plan Administrator interpreted the notice provision to require anything beyond its plain meaning. Thus the court concludes that the Plan Administrator gave a fair and reasonable interpretation to the notice requirement of the Plan.

Leake's arguments that the Plan Administrator incorrectly interpreted the requirement of an approved medical provider and the requirement of an occupational injury are likewise misplaced. At issue is whether Leake used approved providers and whether her CTS was an occupational injury. These are also fact questions, not questions about the legal interpretation of the Plan. Accordingly, the court concludes that the Plan Administrator gave a fair and reasonable interpretation to these Plan provisions.

V

The court turns finally to whether the Plan Administrator's factual findings are supported by substantial evidence. The court must uphold the Plan Administrator's decision if they are. *See Meditrust*, 168 F.3d at 215 ("When reviewing for arbitrary and capricious actions resulting in an abuse of discretion, we affirm an administrator's decision if it is supported by substantial evidence.").

For the factual findings to be supported by substantial evidence, there need only be a rational connection between the known facts and the decision or between the found facts and the evidence. *See id.* ("A decision is arbitrary only if 'made without

a rational connection between the known facts and the decision or between the found facts and the evidence.'" (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828-29 (5th Cir. 1996)).

A

In denying Leake's claim, the Plan Administrator relied on § 8.1 of the Plan, which provides eight different grounds for denying Plan benefits.  The grounds are listed in the disjunctive; any one is sufficient of itself to support denial.  A claim can be denied if, *inter alia*, "the injury does not qualify as an Occupational Injury."  Ds. App. 152.  Based on Leake's medical records and the opinion of Dr. Tonn, the reviewing physician, the Plan Administrator determined that Leake's CTS was caused by a progression of pre-existing conditions that were unrelated to her work.  Thus it found that Leake's condition did not qualify as an "Occupational Injury" under the Plan.

The Plan defines Occupational Injury as: "(i) an injury caused by a specific event occurring in the course and scope of your employment activities for Kroger . . . or (ii) a disease arising out of and in the course of your employment with Kroger that causes damage or harm to the physical structure of the body."  Ds. App. 16 (bold font omitted).  The Plan specifically excludes from the definition of "Occupational Injury" any "illness that is determined by the Plan Administrator to be predominantly the result of the

- 28 -

progression of a preexisting disease, injury or illness." *Id.*
Further, the Plan states that

> [a] repetitive trauma injury will be
> considered an Occupational Injury only if (a)
> it is the direct result of a working event or
> events, (b) a specific date can be proven upon
> which the injury and its causal connection to
> a working event would have become apparent to
> a reasonable person, (c) you report the injury
> promptly upon such date, and (d) it is not
> otherwise excluded from the definition of an
> Occupational Injury under the limitations
> provided above.

*Id.*

In her Associate's Report of Accident, Leake first classified
her condition as work related, stating that the
"scanners–repetitive trauma" caused her injury. *Id.* at 25. But
other than this self-diagnosis, there is no evidence in the
administrative record that would establish that her CTS was work
related. Even if CTS can generally be classified as a "repetitive
trauma injury," under the Plan, Leake still must provide evidence
that the injury was "the direct result of a working event or
events." *Id.* at 16. None of her physicians classified her
condition this way.

Leake's medical reports suggest that Drs. Perkins, Vu, and
Alford all believed her CTS to be the result of an underlying
connective tissue disease. Even Dr. O'Brien, who Leake believed
"explain[ed] [her] correct history the best," P. App. 154, did not
attribute her condition to work. Dr. O'Brien did note that there

was "no evidence of the Diabetes causing a diffuse neuropathy," but she did not note any connection between Leake's CTS and her work as a Kroger cashier.  Ds. App. 125.

Leake's medical records provide sufficient evidence to support the Plan Administrator's finding that Leake's CTS was not an "Occupational Injury" under the Plan.  Not one of her doctors suggests that the CTS is work related, and this evidence alone is rationally connected to the conclusion that her CTS is not an "Occupational Injury."  *See Meditrust*, 168 F.3d at 215. Accordingly, the Plan Administrator did not abuse its discretion in denying Leake's benefits claim based on a finding that her CTS was not an "Occupational Injury."  Because this ground alone is sufficient to dismiss Leake's lawsuit and uphold the Plan Administrator's decision, the court need not address the other grounds on which the Plan Administrator relied to deny her claim.

*      *      *

For the reasons set out, the court grants defendants' motion for summary judgment and dismisses this action with prejudice.

**SO ORDERED.**

September 28, 2006.


_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 30 -